**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| A.H. ON HER OWN BEHALF AND ON BEHALF OF HER SON, M.H., AND M.H. INDIVIDUALLY, | : : : : | |
| Plaintiffs, | : : : | Civil Action No. 05-cv-3307 (PGS) |
| v. | : : | **OPINION** |
| STATE OF NEW JERSEY, DEPARTMENT OF EDUCATION; THE STATE OPERATED SCHOOL DISTRICT OF THE CITY OF NEWARK; DR. WILLIAM L. LIBRERA, VITO A. GAGLIARDI, SR., DAVID HESPE, AND LEO KLAGHOLZ, COMMISSIONERS OF EDUCATION; MARION BOLDEN, BEVERLY HALL, AND EUGENE E. CAMPBELL, SUPERINTENDANTS; THOMAS DUGAN AND HELENE FELDMAN, DIRECTORS OF SPECIAL SERVICES; AND JOHN DOES AND JANE DOES, (MEMBERS OF CHILD STUDY TEAMS, ADMINISTRATORS AND PRINCIPALS AND TEACHERS), | : : : : : : : : : : : : : : : : | |
| Defendants. | : : | |

**SHERIDAN, U.S.D.J.**

Plaintiffs, a learning disabled minor ("M.H.") and his mother ("A.H."), bring this action against the New Jersey Department of Education, State Operated District of the City of Newark, and various individual defendants, for violations of the IDEA, as well as several other claims, in connection with the plaintiffs' alleged deprivation of a free and appropriate public education.

Defendants move to dismiss on various grounds, including failure to exhaust administrative remedies, statute of limitations, and immunity.

I.

The allegations set forth in the Complaint suggest that M.H., now 16 year old, attended Rafael Hernandez Elementary School, at the kindergarten level, starting in September 1994. In the following years between 1995 and 2000, M.H. exhibited academic problems, receiving "D"s and "F"s in language arts, reading, spelling, social science, and math. M.H. was habitually required to attend summer school in order to be promoted to the next grade. Each year, between third and seventh grade, M.H.'s mother, A.H., contacted the District requesting assistance for her son's academic problems.

In light of his struggles, an Individualized Student Improvement Plan ("ISIP") was developed for M.H. as he began the third grade. As part of the plan, M.H. was provided supplemental reading instruction twice a week for 50 minutes and use of a computer-based program twice a week for 30 minutes. At the conclusion of third grade, with no improvement in M.H.'s grades, in or around June 1998, M.H.'s teacher noted that M.H. had "possible dyslexia."

As M.H. began the fourth grade, a second ISIP was developed in October 1998 providing for in-class instruction in basic skills and "ESPA Preparation" four times a week. While the plan identified deficiencies in math, language arts, reading, and literacy, by the end of the school year, M.H. showed no improvement. By the fifth grade, M.H. was reading at a level no higher than that of a first grader.

In April 2000, A.H., with the assistance of one of M.H.'s teachers, requested, in writing, that the Child Study Team evaluate her son. An identification meeting was held on May 19, 2000 to

discuss the types of evaluations that would be performed. Those in attendance, including M.H.'s fifth grade teacher, a social worker, a learning consultant, the school psychologist, the school principal and A.H., agreed that an educational, psychological, and medical assessment would be performed.

The assessments were not completed until October 25, 2001, after which another meeting was scheduled to determine whether M.H. was eligible for special education and related services. On December 3, 2001, M.H. was found eligible as "Specific Learning Disabled." However, the plaintiffs claim that A.H. was not provided with prior notice of the meeting, the purpose of the meeting, or advised of her procedural rights under the Individuals with Disabilities Education Act (IDEA).

An Individualized Education Program (IEP) was not developed until February 2002[1] and, further, in developing the program, the Child Study Team failed to hold a meeting to discuss the IEP or obtain input from M.H.'s parent. This IEP, however, was not immediately implemented as the District attempted to locate an in-district placement, which proved unsuccessful. As a result, the required services were not provided to M.H. for the entire 2001 - 2002 school term.

A representative for the plaintiffs requested an IEP meeting and asked that M.H. be provided with out-of-district placement. Both requests were initially denied. In September 2002, the District began to implement the February 2002 IEP, through which M.H. was placed in a self-contained class. When it became apparent to A.H. that the program was not meeting M.H.'s needs, A.H.

---

[1] While plaintiffs maintain at ¶ 39 of the Complaint that an IEP was developed in February 2002, at ¶ 42 of the Complaint, plaintiffs suggest that the IEP was developed in December 2001 and allege that a representative of the Defendant District altered the dates of the document to make it appear as if the IEP was signed in February 2002.

requested that M.H. be removed from the self-contained class, be placed in a resource room program, and sought to obtain independent evaluations. These evaluations, performed between September 18, 2002 and September 30, 2002, indicated that M.H. had a central processing disorder, "significantly depressed" skills in reading and written expression, and central auditory processing deficits in auditory decoding. While these results were shared with the District, the District never provided an indication as to whether they would accept or reject the findings.

Upon M.H.'s entrance into the ninth grade, in September 2003, following A.H.'s threat to file for due process, the District agreed to send M.H. to an out-of-district placement at the Essex Valley School in West Caldwell, New Jersey. However, no IEP was developed, no meeting was held, and notice of procedural rights was not provided. Ultimately, the out-of-district placement to which M.H. was sent was for children with behavioral disorders, which proved inappropriate. Notwithstanding several unsuccessful requests by A.H. for removal, M.H. spent the entire 2003 - 2004 school year in an alleged inappropriate placement.

In March 2004, a meeting was held at the Essex Valley School attended by the case manager, a supervisor from the District, the principal, A.H., and legal representatives. At the meeting, it became apparent that M.H.'s program did not include reading or a focus on his reading and writing disorders and his teacher was neither a certified special education teacher nor a reading specialist. The District agreed to provide additional evaluations at the meeting, including a speech and language assessment and an independent educational assessment. While A.H. also requested a psychological evaluation, the District's psychologist did not believe it to be necessary. A.H., in disagreement, obtained an independent psychological evaluation on her own, which according to plaintiffs proved instrumental in getting M.H. admitted to the Craig School in the coming year.

4

In June 2004, the District provided copies of the evaluations to A.H.  Taking issue with the findings of the speech and language assessment, A.H. requested an independent evaluation, which was conducted on April 15, 2005.  This time, the evaluation revealed that M.H. had overall severely impaired expressive and receptive language skills as well as problems remembering, formulating sentences, and weak semantic skills.  An independent educational evaluation conducted on May 7 and 8, 2004, suggested a reading disorder and a disorder of written expression.   A psychological evaluation revealed that M.H. was of average intelligence and possessed a reading disorder and disorder of written expression.

In the fall of 2004, M.H. was placed at the Craig School in Lincoln Park, New Jersey.  In November 2004, A.H. worked collaboratively with the District to develop an IEP, which plaintiffs concede began to meet M.H.'s educational needs.  However, it is the plaintiffs' contention that with only two more years of schooling before M.H. is expected to graduate, there is insufficient time within which to make up for the failure to provide an appropriate education, and accordingly, a suit for money damages is timely.

II.

On a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  *In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that

person will ultimately prevail. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, *Fed. Practice & Procedure*: Civil 2d § 1357 at 340).

The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment. FED. R. CIV. P. 12(b).

In the context of an IDEA claim, the exhaustion of administrative remedies is a jurisdictional matter. *W.B. v. Matula*, 67 F.3d 484, 493 (3d Cir.1995). Accordingly, the appropriate device is a motion pursuant to Rule 12(b)(1). See Fed. R. Civ. P. 12(b)(1) (providing for dismissal of complaint where court lacks subject matter jurisdiction). See *Falzett v. Pocono Mtn. Sch. Dist.*, 150 F.Supp.2d 699, 701 & n. 2 (M.D.Pa.2001).

### III.

The IDEA and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, provide equivalent requirements. The IDEA, provides an affirmative duty to provide education, whereas the Rehabilitation Act prohibits discrimination against the disabled. *Matula*, 67 F.3d at 492-93. The third law under which the plaintiffs sue is the Americans with Disabilities Act (ADA), 42 U.S.C.

§12101-12. Like section 504, the ADA prohibits discrimination against the disabled. The fourth statutory claim that the plaintiffs make is filed pursuant to 42 U.S.C. §1983 (hereinafter "section 1983"). Section 1983 is not a source of substantive rights, but is rather, a means to redress deprivation by state officials of rights secured by the United States Constitution or certain federal statutes. *Matula*, 67 F.3d at 493. Section 1983 may be used to remedy a violation of the IDEA. *Id.* at 494. While these causes of action make up the gravamen of the plaintiffs' Complaint, plaintiffs also assert due process claims and a cause of action under the New Jersey Law Against Discrimination (NJLAD), *N.J.S.A.* 10:5-1 et seq.

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). It requires states to provide disabled children with a "free appropriate public education" ("FAPE"). *Id.* § 1412(a)(1); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 9 (1993). States must offer "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982); see also 20 U.S.C. § 1401(9). The program of education offered to the student does not have to be the best available, but must "confer some educational benefit." *Rowley*, 485 U.S. at 200. To this end, a state must conduct "a full and individual initial evaluation" of the child, and develop an Individualized Education Plan ("IEP") before implementation of any special education program. 20 U.S.C. § 1414(a)(1)(A). An IEP is a detailed instruction plan tailored to address the child's educational needs, and serves as the "primary mechanism" to ensure that a disabled child receives a FAPE. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir.1995); see also 20 U.S.C.

§§ 1401(14), 1414(d).  Importantly, an IEP must provide for "significant learning" and confer a "meaningful benefit" to satisfy the requirements of a FAPE. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir.2000).  The "IDEA's central goal is that disabled students receive an appropriate education, not merely an appropriate IEP." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 250 (3d Cir.1999).

While the IDEA sets forth an affirmative duty to provide an appropriate education to disabled students, §504 of the Rehabilitation Act is a "negative prohibition against disability discrimination in federally funded programs." *Matula*, 67 F.3d at 492.  However, "[t]here appear to be few differences, if any, between IDEA's affirmative duty and §504's negative prohibition." *Id.* at 492-93.

To establish a violation of §504, a plaintiff must demonstrate that: (1) the student was disabled, (2) the student was "otherwise qualified" to participate in school activities, (3) the school receives "federal funded assistance," and (4) the student was excluded from participation in, denied benefits of, or subjected to discrimination at the school. *Ridgewood Bd. of Educ.*, 172 F.3d at 253. A plaintiff need not demonstrate intentional discrimination.  *Id.*  A finding of "bad faith or gross misjudgment" will stand in its stead. See *McKellar v. Commonwealth of Pa. Dep't of Educ.*, 1999 WL 124381, at *5 (E.D.Pa. 1999) (citing *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir.1982)).

Finally, the ADA is similar to the Rehabilitation Act, but it "extend[s] section 504's anti-discrimination principles to public entities." *Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir.1995); see also 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). All of the same elements, except the third element relating to federal funds, are required to establish

8

a prima facie case of discrimination under the ADA. 42 U.S.C. § 12132. Like claims under §504, claims under the ADA do not require intentional discrimination; discriminatory effect can be the basis for ADA claims. See *Helen L.*, 46 F.3d at 331-32.

IV.

Defendants argue that plaintiffs' claims for violations of the IDEA, and companion claims, must be dismissed on account of plaintiffs' failure to exhaust available administrative remedies before filing the instant lawsuit.

Generally, under the IDEA, plaintiffs must exhaust their administrative remedies before proceeding with a civil action in federal court. 20 U.S.C. § 1415(f) (1994); *Matula*, 67 F.3d at 495. Even though the policy of requiring exhaustion of remedies in the Disabilities Education Act is a strong one, some exceptions have been recognized. In *Honig v. Doe*, 484 U.S. 305, 327, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988), a case brought under an earlier version of the Act, the Court stated that "parents may bypass the administrative process where exhaustion would be futile or inadequate." Further, an exception exists where the issue presented is purely a legal question, *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 869-70 (3d Cir.1990), or where the administrative agency cannot grant relief. *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775 (3d Cir. 1994).

However, this exhaustion requirement is, by its very terms, limited to claims where plaintiffs are seeking relief that is also available under the IDEA. 20 U.S.C. § 1415(f). This provision bars plaintiffs from circumventing the IDEA's exhaustion requirement by taking claims that could have been brought under the IDEA and repackaging them as claims under some other statute--e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA. See *Matula*, 67 F.3d at 495-96 (3d

9

Cir.1995) (citing the legislative history of § 1415(f) as stating that "parents alleging violations of section 504 [of the Rehabilitation Act] and 42 U.S.C. § 1983 are required to exhaust administrative remedies before commencing separate actions in court where exhaustion would be required under [IDEA].") (quoting H.R.Rep. No. 99-296, 99th Cong., 1st Sess. 7 (1985)); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir.1995) (holding that exhaustion is required as to ADA claims). Thus, it would follow that a plaintiff cannot demand relief not available under the IDEA, i.e. monetary damages, where the typical relief under the IDEA would adequately remedy the situation, in an effort to avoid exhaustion.

Courts require exhaustion where the peculiar expertise of an administrative hearing officer is necessary to develop a factual record. *Lester H.*, 916 F.2d at 869. The District Court is not best equipped to determine whether M.H.'s evaluations and placements were timely and proper; and to assess the future educational needs of the child. In this Court's view, ascertaining and making available appropriate education measures, albeit late, is the paramount concern. If a suit for money damages is permissible, it should be commenced after all educational avenues are pursued. Plaintiffs' have made clear in their Complaint, and again at oral argument, that they seek, among other things, compensatory education, which "requires a school district to provide education past a child's twenty-first birthday to make up for any earlier deprivation." *M.C. on Behalf of J.C. v. Central Regional School Dist.*, 81 F.3d 389 (3d Cir. 1996).[2] This available avenue remains a viable option for plaintiffs to seek appropriate relief. The education of a child is the most important goal.

---

[2] "[T]he term compensatory education may also be used in a different sense to refer to special programs and services provided to "at-risk" students who are not succeeding in school but do not qualify for special education. Such programs include alternative schools, pregnancy and parenting programs, and group counseling programs." *M.C.*, 81 F.3d at 395, n. 3 (citing Catherine P. Clark, *Compensatory Education in Texas* (1993)).

10

At the age of 16, plaintiffs have voiced concerns that M.H. is expected to graduate in two years and there remains insufficient time within which to make up for the alleged failures of the defendants. However, a free and appropriate education are afforded to "children with disabilities residing in the State between the ages of 3 and _21_." 20 U.S.C.A. §1412 (emphasis added). Therefore, after a full factual proceeding before the appropriate administrative law judge, a determination can be made whether M.H. was deprived of a free appropriate education for any of the years between 1994 and 2004, and if so, whether M.H. is entitled to a free and appropriate education beyond the age of 18, and further whether compensatory education is necessary and appropriate.

Plaintiffs' Complaint is grounded in violations of the IDEA. Therefore, plaintiffs allegations of violations of the ADA, Rehabilitation Act, Fourteenth Amendment, NJLAD and New Jersey Constitution cannot be used as a tool to avoid exhaustion. Therefore, plaintiffs' Complaint is dismissed without prejudice, pending exhaustion of administrative remedies.

V.

The Court need not address defendants' arguments concerning the statute of limitations, immunity, or constitutional issues at this time. To protect the interests of M.H., the Court will toll the statute of limitations during the time for which plaintiffs seek to exhaust their administrative remedies. Equitable tolling, which presumes claim accrual, is invoked to toll or stop the running of the statute of limitations in light of established equitable considerations. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d Cir.1994). The Court is aware that plaintiffs filed their application on June 30, 2005, one day prior to the effective date of the IDEA amendments which provide for a statute of limitations of "not more than 2 years before the date the parent or public

11

agency knew or should have known about the alleged action that forms the basis of the complaint."

See 20 U.S.C. § 1415(b)(6).[3] Following the administrative hearing, should plaintiffs' be unsatisfied

with the rulings or remedies provided, any claims that would have been timely in the Complaint filed

on June 30, 2005, applying the statute of limitations as it existed on that date, will be deemed timely

upon re-filing.  At that time, should it become necessary, the Court will rule on the issues of statute

of limitations, immunity, and the constitutionality of the abrogation of state sovereign immunity in

enacting Title II of the ADA.


_____

November  20, 2006                        PETER G. SHERIDAN, U.S.D.J.

_____

[3]  The IDEA, as amended on December 3, 2004, was made effective as of July 1, 2005.
However, because amendments to the IDEA are not retroactive, the Court must apply the IDEA
as it existed when the plaintiffs filed their Complaint.  See *Lawrence Twp. Bd. of Educ. v. New
Jersey*, 417 F.3d 368, 370 (3d Cir.2005); *J.M. v. Kingsway Reg'l Sch. Dist.*, 2005 U.S. Dist.
LEXIS 18110, at *13 n. 5 (D.N.J. Aug. 18, 2005).